Thank you. And before we begin, let me just mention, Mr. Ahmadi, we very much appreciate the incredible effort you must be going to arrange for this. And I frankly wasn't expecting to be able to see you. I thought it was just audio. This is much better. We have some time restraints that you may well be familiar with. We want to make sure that you have an opportunity to let us know what's going on from your perspective and to share with us anything that you think is important for us. But I also would ask that you be respectful of our time limits. We've given you five minutes to make your position known. During the course of that, we're going to be asking you some questions. And this may sound very simple, and I hope it doesn't sound condescending, but it's important. Most lawyers don't do this. I would ask that you, one, let us ask the question. Stop so we can ask you the question. Listen to the question and answer the question we have asked you. And again, I don't want to be patronizing to you. Most lawyers do not do that in oral argument. I want to just reemphasize that. So having said that, then why don't we start with Mr. Ahmadi? Mr. Ahmadi, why don't you go ahead, sir? You're on mute. Okay. Yeah, I need five minutes additional time if this is any way possible, because in the five minutes... Let's see how it goes. Let's see how the first five minutes goes. And if you need more time, we've been giving all counsel additional time if they need it. If the first five minutes is productive, we're not going to cut you off. Sure. Thanks. Thank you very much. Okay. May it please the court. My name is Syed Nisar Ahmad Ahmadi, the petitioner in this case. I'm representing myself with the assistance of amicus counsel, Jacob E. Hartman, who will introduce himself later. I am respectfully asking this court to grant my petition for review and injunctions, which I am entitled to by law. No remand should be made to the district court, to the Board of Immigration Appeals, BIA, or to the Administrative Appeals Office, the AAO. The reasons are, one, all available administrative remedies have been BIA or the AAO to decide my legal claim of being a national of the United States. Your honors, this is a case that shocks the conscience. It is about an illegal deportation of a non-violent person from the state of Pennsylvania who was, one, admitted to this country as an 11-year-old refugee from a totalitarian state, pursuant to HUSC Section 1157C2A. Two, became a lawful permanent resident LPR of the United States, pursuant to Section 1159A2. Three, rightfully and successfully became a recipient of the United Nations Convention Against Torture, CAT relief, on September 26, 2000. And four, was naturalized or admitted as a national of the United States under the Child Citizenship Act, CCA of 2000. The key was you said about the CAT relief. I didn't catch that. Well, the immigration judge, he went through my case for nearly three years. He realized that a refugee cannot be sent back to a country where he's going to get killed. But were you ever awarded relief under the Convention Against Torture? Yes, sir. Yes, your honor. I was, on September 26, 2000. That's the date that the immigration judge granted me the CAT protection. Mr. Ahmadi, you spoke to us and we granted the motion to supplement a certificate of naturalization. Is Hikmatullah Syed Ahmadi, is that your father? Yes, sir. Yes, your honor. That's my father. Okay. And he naturalized on September 23, 1999. You were, what, 28 years old at the time? Of course. Of course. I was over 18 years old. But here's the thing. When Congress was creating the CCA, the child citizen, Congress knew for a fact that there were people like in my situation where they could become citizens. The only problem was like what happened with the immigration authorities, they dragged me into something where I did not belong. So when you're in the immigration proceedings, you cannot go apply for citizenship. First, you have to deal with the entire process. Then when you're free, then you can go apply. So that... Can you be... Oh, I'm sorry. Go ahead. I'll wait. So that proceedings, which began in 1997, prevented me from applying for citizenship. Now... Okay. I did want to ask you, could you be more specific about the proceedings that you say you were dragged into? Well, the whole removal proceedings began by mistake. I know for a fact it began by mistake. I did not belong in deportation or anything. What was the mistake? Well, I never committed anything that would create this problem for me. Removal proceedings is only for people who are illegal or who committed certain crimes. Now, mine is a petty Pennsylvania offense. For example, if you get traffic tickets, the immigration authorities cannot drag you and say, let's go. We got to deport you just because you got traffic tickets. My violations are, in fact, they're DMV related stuff. They're not... No intentional crimes or anything were committed. I mean, they were a little bit more than just traffic tickets. They're Pennsylvania petty offenses. The maximum sentence is up to one year. Now, I only got... That doesn't sound like a petty offense to me. Could you be more specific? What was that offense? You're referencing traffic tickets and minor offenses. Well, when you're driving a vehicle and it's not registered, the police can give you all kinds of... I understand that. That's a traffic offense, but yours was more serious, wasn't it? It was in a way because if you look at the facts, I have all the facts and everything. Without going, can you just specify what the offense was? It was the false name or address, either one. If you put a false address... One was being convicted of carrying a firearm in a public street in 1993, and I thought the other one was being convicted of falsifying a certificate of title or registration and forging your counterfeiting license plates. That was May of 97. Is that right? Actually, it wasn't... Falsifying or counterfeiting were not involved. It's altered. The falsifying is either you put a wrong address in an application. One of those applications... But we can't do anything about that. That's there. The conviction is there. That's a state court. This is a federal court. We can't do anything about that. That's just there, and so we have to accept that. Nothing we can do about it. I know. I understand that. I understand that, Your Honor. I understand that. It is not an aggravated felony. This is what I'm arguing. If it's an aggravated felony, then it is, but in my case, it is not. It is for a fact. It's not an aggravated felony. Very often, it depends on your maximum jail exposure. What was it in your case? Two months, and it was pre-confinement. The judge did not say, you got to go serve two months in jail. No, no. It's what the statute says, not what the judge did. Yeah. Two months was pre-confinement. On the day, the judge gave me probation, which is Pennsylvania County probation. I had to serve 23 months of maximum, 23 months of parole. Probation, parole, it's county parole. It's not one of those where you have to report to the parole department. The strange thing about Pennsylvania is, you can get what we call in Pennsylvania, a county sentence, which in any other state in the federal system would be defined as a felony. In Pennsylvania, a statute which allows incarceration up to five years is a misdemeanor. It's the only state I know of like that. Usually, if you can get one year and a day or more, that's a felony. In Pennsylvania, it's very strange. Even though it may have been defined as a county sentence in terms of the time, 11 and a half to 23 months, which would be a pretty typical sentence in Pennsylvania, of course, for a county sentence, that 23 months is the problem. Your Honor, it's what the judge does. In my case, the judge said, you served two months, which you served already. That's pre-confinement time. He said, now you got to report to us, which I did. When I reported for six months, the judge said, well, it's the court, the whole court. County parole, it's controlled by the court. They said, don't report to us anymore. Your Honor, the only thing that was going to help us here is whether or not you had established that you were a naturalized citizen when you were going through all of these proceedings. That's legally the only thing we can reach your address. Now, you mentioned already that your father was naturalized after you turned 18? Yes, yes. That well, that's... When was your mother naturalized? In 2009. Also after you turned 18? Yes, yes, Your Honor. That means you're not eligible for a derivative citizenship. That does mean that, Mr. Mahdi. To understand, there's nothing we can do, statute says what it says, unless you can show that before you turned 18 and were an adult, both of your parents were naturalized. If that's the case, you obtain derivative citizenship, and the INA, the Immigration Nationality Act, does not apply to you. But if that's not the case, then you could not, just because of your parents' naturalization, also become naturalized as an American citizen. You have to take those steps and do that on your own. That hasn't happened yet. And that's... Your Honor, my argument is I'm not an aggravated felon, and there's nothing in the immigration law that says that I'm deportable. There's nothing. Number two, the CCA... That's a different argument, but that's... I understand. The Child Citizenship Act is retroactive. It's 100%. I did a lot of research. Now, the way that I get it... Could you elaborate on that, please? Because that is important. It is. And you say it's not retroactive. I missed your argument there. No, the Child Citizenship... Your Honor, the Child Citizenship Act was created to be, to operate retroactive in my kind of situation. That person must be clean from criminal record. If he's clean, if he can go apply for citizenship, then there's no reason why he shouldn't become a citizen. The only... Well, you have derivative citizenship, derivative, if you make an application or you apply for it before your 18th birthday. I understand that you did not do that. Am I accurate? Your Honor, you're correct. That is for different... There's another procedure for that, but my situation is automatic. You don't do anything, no application, nothing. When the day comes, the February 27, 2001 passes, you had all of these three things, the conditions met. You're automatically a citizen. In order for you to get the application, the certificate of application, you have to go apply for that. That's up to you. If you don't want to get it, you don't have to. What is automatic? You're becoming a citizen when you turn 18? I missed that point. 18. When you're 18 and your father is a citizen, like in my situation, and the second is under 18, and the third one is when you're a legal permanent resident, a lawful permanent resident. Can you tell us that your father became a citizen after you became 18? That's the reason Congress created the CCA for people like in my situation. There are three categories. One is the plain and simple ones, the ones that meet the conditions on that day. The second one is somebody in the future will get this. The third one is for somebody who missed the one condition. The only way to go retroactive for it to work retroactively in my situation, like for example, if you're going back to the future car, in the movie Back to the Future, my father sits with me in the car. We go to 1988. When I'm 18, we come back and we accomplished everything. This is non-proton relief. I'm sure you know what that is. Non-proton relief works that way. If you meet all of these three, you're automatically a citizen, but there's a catch to all of this. No aggravated felony condition ever, and another has never been convicted of a crime involving moral turpitude. I think there's another one where the attorney general can come up with his own reasons why you should not become a citizen. If you meet all of these three things, you're clean as a baby. If you can get a citizenship with the application, you can get it automatically the same exact way. The catch is, remember, you have to be clean from criminal record. Right. Mr. Ahmadi, the problem may well be that you have a 97 offense, which under federal law may be taken as an aggravated felony. It's a firearms violation. I proved it. Your Honor, let me just stop you right there. Mr. Ahmadi, the conviction's there. The conviction's on the record. I can't take it away. Your Honor, let me just clear this. The firearm violation throughout history has never been one that makes a person inadmissible, especially a lawful permanent resident. He can carry a firearm. There's no law that you cannot carry a firearm. And number one, it wasn't even a firearm. If you look at the record, there's a police report. It's duly signed. The Philadelphia Police Department is saying there was no firearm. I thought, Mr. Ahmadi, that you actually pled guilty to the offense. Your Honor, if you look at the definition, we have to go by the statutory definition. We cannot say, oh, because immigration officials say this person committed murder. We have to go and say, well, he committed murder. We have to look at what the person says they committed murder. That's a different story, though. So I mean, well, a firearm offense could become an aggravated felony in some cases. Now, murder is an aggravated felony. The next thing you know, if you put these together, it's like you're convicting somebody for a murder charge. I think it depends on your maximum exposure, the maximum sentence that can be imposed. Your Honor, I got probation. I got probation on the firearm. No, no, no. It's not the actual sentence. It's the maximum sentence that affects the grading of the offense. For which one, Your Honor? For both of them. No, actually, Your Honor. What we have to look at is not how much time you may have served, but what the statute provides is the maximum sentence. Even if you got probation, it could be an aggravated felony. That's the problem. Your Honor, we have to go by the statutory text. If you look at the aggravated felony conviction, there's a long list. It goes into details. It has to be a perfect match. We cannot say, well, we believe this can be this based on the name of the offense. We have to look at the statutory definition. What is it? And we can look at the record. In my record, I'm saying, please, look at it. I know. We can't. Under the law, all we can look at is there's a conviction there. We can't go back to the record and find out what exactly did he do. We have to look at what you're convicted of. None of us wrote this. Judge Bevis didn't write that law. Judge Fuentes didn't write the law. I didn't write the law. And speaking only for myself, if I had the authority to draft immigration laws, there'd be a whole different statutory scheme than we have right now. You wouldn't even recognize it. I don't have that authority. I wear a black robe, not a suit. I don't go to Congress. I go to a courthouse, except when I'm sitting at home. But let's hear what your attorney has to say. He might be able to help us all out here. Mr. Hartman, anything you want to add to this to help Mr. Amati's case out? I know you're here on the issue of timeliness and exhaustion. To the extent you can help us on this aggravated felony issue, you may not be prepared for that. If you're not, you're not. But why don't you go ahead? Good afternoon, Your Honor. And may it please the court, my name is Jake Hartman. I'm appointed to Amicus Council on behalf of the petitioner. Your Honor, I will tell you I am prepared today to speak on the three questions on which I was appointed, specifically on two relating to jurisdiction and one on the evidence. I do not have a position on the aggravated felony issue. However, as is always important for this court, I think that the jurisdictional issues are still important. And I think that they merit ventilating here. We have to be satisfied if what happened to Mr. Amati did not constitute an aggravated felony. We do have jurisdiction to look at that. And I understand that that was not something that we asked you to argue. Initially, Mr. Amati's made the argument for himself very forcefully and in a very informed and professional manner. That is something we're going to, obviously won't decide the case today, but all three of us will take a long hard look at that. I already had, I hadn't focused on that until Mr. Amati spoke. We'll go back and take another look at it. Go ahead. And Your Honor, if it would be helpful for the court, I'm happy to suggest to folks earlier today to provide whatever input. I will note, however, that the court has jurisdiction to and should decide Mr. Amati's claim that he's a U.S. citizen today. The procedural bars don't apply to claims of U.S. citizenship under Rule 1252b-5. As for the exhaustion bar, this court in Ogundoju has already decided that it doesn't apply to citizenship claims. And the so the only outstanding issue on that question is whether, and I would argue that it does not, for textual, logical, and constitutional reasons. Beginning with the textual, this court recognized in Judge Evas' opinion in DeSothi v. Attorney General, that the mandatory language of 1252b-5 means that this court not only can review claims of citizenship, but indeed is obligated to do so. That conclusion aligns with century-old Supreme Court precedent. It guarantees the putative citizen the right to a judicial hearing. We have a separate issue if it's foreclosed here. Is there a constitutional problem? But let's parse the statute first. So we have B-1, 2, 3, and 5. And B-1, 2, and 3 come before B-5. They set out some requirements. Some of them explicitly reply to a petition. Some of them, like B-3a, B-3c is expressly limited to aliens. But why don't you have to hop through B-1, 2, and at least B-3a and B-3b before you get to 5? I mean, DeSothi was in a different posture. There are other ways to raise claims like a motion to reopen. So if we set aside constitutional concerns and just focus on text here, why not parse through this section in order and so you don't get to the shell beside the claim until you first satisfied yourself that there's timeliness and service where service is required? Your Honor, I think that that actually ties to my second point, which is the logical reasons that Section B-1 can't apply. While it's true that the statute does move back and forth in describing actions by petitioner and by alien, it does so in a way that makes clear that that language is not used intentionally. Indeed, as we pointed out in our brief, while Section B-1 does refer to the petitioner, shortly thereafter, when it describes the actions that must be taken, it explains that the alien is required to serve and file a brief in connection with that petition. Okay. So C-3c then doesn't apply if you're a citizen, but why can't nothing in the deadline is specific to aliens? The deadline just applies to all petitions for review. So why not take that textual difference seriously and say, you got 30 days, it's an ordinary timeliness rule, and then we'll deal with these constitutional concerns. If the timeliness becomes an issue, maybe you can get an exception if that's the only way, but we'll talk about maybe this isn't the only way to get review of a citizenship claim. The short answer, Your Honor, is as this court pointed out in Obundoju, and as the Supreme Court pointed out all the way back in Enfenghou in 1922, the executive has no authority to deport a citizen. These laws necessarily only apply to aliens. And while the government has said repeatedly that B-1 is mandatory and jurisdictional, we don't dispute that that's true for individuals who are indisputably aliens. And indeed, that's the mind run of cases that this court sees. But the position is different when we have someone who is a putative citizen. If indeed, the petitioner is a citizen, the law does not apply to them writ large. All right. Now we're sliding into the constitutional issue, and I get that these interlace. Thank you for developing that. But B-1's jurisdictional, as you said. But when we get to petitions to reopen, which was the posture in Dasuki, there are time and number bars there, but those, as I understand it, are not jurisdictional. So if we're going to carve out an exception to something, isn't the logical thing to say, go file a motion to reopen that gets time or number barred, but then we would dispense or cut a hole through a non-jurisdictional rule there to make sure a citizenship claim gets heard, rather than cut a hole through a jurisdictional requirement that's here in B-1? Judge Bevis, I think that it's better and more consistent in terms of harmonizing the statute to read B-1 as subject to the same treatment as D-1, the exhaustion bar. I'll note that this court had said previously that Section D-1 was indeed a jurisdictional limit. But D-1 expressly talks in terms of the alien. So maybe we should hold D-1 doesn't apply if you're contesting citizenship because of the word alien, but B-1 However, my point is a broader one, which is that the mere fact that the provision was treated as jurisdictional hasn't previously served as a bar for finding that it doesn't apply in circumstances where an individual has a punitive claim to citizenship. And I certainly acknowledge that the use of the term language, pardon me, the use of the term alien in D-1 could be seen as a differentiator, but our position is that because of the fact that an alien, that none of these provisions apply to an alien, that the same logic should apply throughout. Yes, there's another case here that has been closed. That's 20-1312, I believe. Are you familiar with that case at all, Mr. Hartman? I am familiar in general with the procedural posture, though less with the details of the case. Okay, and what I'm wondering is, in that case, we don't run into a lot of the exhaustion and timeliness issues that we do in this case. And I can address the same issue to Mr. Anderson, that maybe the best way to get a handle on this is to open that case and consolidate that case with this case. And then we would have, it seems to me, a case that goes back to the initial decision to remove, I think that's right, I'm not that familiar with the details of that case of 1312, because it's not before us right now. It was closed out administratively. Maybe that's the best way to combine the two cases and then take it that way. Judge McKee, I don't disagree that were the court to reopen that case, there would no longer be a timeliness issue to the extent that, and again, with the caveat that my memory of the brief in that case is limited, to the extent that there was a exhaustion issue, specifically whether this it wouldn't be any further bar, again, under this court's ruling in Oguntoya. The trick there is going to be, if Mr. Ahmadi is a citizen, the timeliness things that we're talking about wouldn't apply or exhaustion. And I don't know that that gets into the constitutional realm, but it's clear the INA is only created to deal with people who are not citizens. If Mr. Ahmadi is in fact a citizen, and I assume we're talking now only about derivative citizenship, there's nothing to suggest that on his own after he became 18, he went through a naturalization. If he is, then a lot of these other hyper-technical issues are resolved. But my concern now is that I don't think the record would support that claim of derivative citizenship in this case or that case. And it may be impossible for that game to be established, that in which case we'd be administratively reopening the other case, consolidating it and then foreclosing recovery in both cases, which doesn't get Mr. Ahmadi what he's trying to get. Judge McKee, I agree that, from an outcome standpoint, that that would be no better. But what you've pointed out, I think, actually illustrates a further reason that treating B-1, as the government suggests, in cases of punitive citizenship is simply illogical. One of two things must be true. Either B-1 is strict and mandatory and jurisdictional, in which case all of the constitutional issues that we've raised under the Fifth and Fourteenth Amendment, as well as the suspension clause, are in play. Or it is, as the government suggests elsewhere, something that can be overcome through filing a motion to reopen or doing a reconsolidation, in which case the notion that it is this strict, mandatory jurisdictional bar is somewhat frivolous, because all it's doing is asking a petitioner or this court to transfer a case, transfer it back, reconsolidate, and bring us right back to where we are here. As the Tenth Circuit has actually pointed out, the question of whether or not Mr. Ahmadi is a citizen is a jurisdictional question for this court. And it's one that the BIA, the BIA's opinion on, for these purposes, is essentially irrelevant. So sending it back only to have it bounce back to this court, if that were even to happen, rather than it simply being dismissed as time and number barred, would provide no additional insight to this court. That was the reason that we suggested in our briefing that Mr. Ahmadi, or perhaps the government, supplement the briefing with the records that would clarify the derivative citizenship issue. That seems to be the whole thing. And that, it all boils down to, I think, the issue of derivative citizenship and the statute that Mr. Ahmadi mentioned that I'm going to speak to my colleagues when we're done, but it makes a lot of sense to me to ask you to look into that issue and help Mr. Ahmadi in that regard and submit. So I'm going to brief both yourself and Mr. Anderson on that issue. But go ahead. I think you've got a little bit of time left if you want to proceed. I could be wrong about that. Yes. If I may, I would like to just briefly address the constitutional issues that would arise if B1 is treated as strict, mandatory, and jurisdictional. I really think it's pretty self-evident. We'd then be authorizing the deportation of someone who is a United States citizen under the guise of saying that they're not a United States citizen. I cannot imagine a scenario where that person's claim could not be raised and that we would have jurisdictions, we must have jurisdictions to determine our own jurisdiction. And in that case, the jurisdictional question is, is this person a citizen? Because if they are, then they're not even subject to the provisions and the restraints of the INA. Mr. Hartman, though, that concern only applies with full force if there's no pathway to raise this. And I've suggested that there is a pathway via motion to reopen. So why is there a constitutional concern if we channel these citizenship claims through motions to reopen, which seem like they're always going to be available without a jurisdictional bar? Why would there be a constitutional problem with saying you can't do it the way Mr. Ahmadi is doing it now? You have to go and file a motion to reopen to do it. Well, to begin, Judge Bevis, I'll note that the government has opposed the notion in the past that an individual in Mr. Ahmadi's position can file a motion to reopen that the BIA can actually consider and that it instead is barred from a number of bars, the time bar, the number bar, the... I'm blanking on the name of the bar, but it's when an individual's been out of the country for more than 90 days. They can deny that, but then it comes to us on a petition for review, and we could hold that that was based on an incorrect understanding of the law or overlooked constitutional concerns, and we could grant the petition for review at that point. You're right that internally they might feel like they're obligated to deny it, but the issue will get to us eventually. Well, Judge Bevis, I think that that takes us to our point as to the suspension clause. As we noted, prior to the passage of the REAL ID Act in 2005, the Supreme Court in St. Cyr and a number of appellate courts, including this one, raised serious concerns about what would happen if habeas relief were removed from the statute, which indeed is what Congress did with the REAL ID Act in 2005. I think these are exactly the issues that they were concerned about, not just that there would be no avenue, but that there would not be an avenue that is a sufficient replacement for habeas. But there's plenty of precedent. Jennings, our recent decision to go to H.C., we understand the REAL ID Act. There's a zipper clause in it. It funnels a lot of these things and bypasses habeas. Habeas is basically... So, what's the problem if it is true? I mean, you can raise an objection to why it is true, but if it is true that emotional reopen would get denied by the agency but come to us, why would that not satisfy the constitutional concerns that you're alluding to? As you say, they've been referenced in a bunch of cases. I'm very sorry, Judge Bevis. I lost about half of that question because it was too quiet. The audio cut out. I'm sorry about that. So, you are right that there's case laws saying there are constitutional concerns, but there's also case law, Jennings and a bunch of others talking about the zipper clause aspect of the REAL ID Act funneling these claims. If the effect of the law is to bypass habeas and to funnel these claims into motions to reopen, and let's say the agency feels constrained to deny the motion to reopen, but then we can review that and maybe we can dispense with the time and number bars as non-jurisdictional, what would be the remaining constitutional concern with funneling them through that procedure rather than borrowing them outright? Judge Bevis, I think that the answer is that we would have a problem with the ability of a petitioner, especially in a case like this with a pro se petitioner, being able to develop an evidentiary record in a way that would have historically been allowed in a habeas proceeding. Again, we're talking about a petition to the BIA that's going to get dismissed out of hand without any opportunity to develop any evidence, and then we're in this court where it is true that the statute allows some flexibility beyond the normal scope of what this court can consider, but it's still not the kind of opportunity that a petitioner would have in the district court in the circumstances of habeas. Mr. Hartman, that takes me to, have you read the court's decision? Yes, Your Honor, I have. Okay. Now, in your brief, one thing you say is you recognize 1252G is a jurisdictional bar, right? And another thing you say is that the relief, that there'd be a suspension clause problem with depriving him of this relief, but Thoracicum says the only right, the suspension clause, at least they don't quite close the door, but they operate on the assumption that the writ is confined to what it was in 1789. Whether it is or not, a relief that the suspension clause was designed to protect was released from custody. And Mr. Amati is not seeking release from custody. He's not in custody. He's seeking immigration relief to restore his ability to be in the country. It's the relief he's seeking is different from the relief that Thoracicum says is the only relief protected by the suspension clause. What's the constitutional problem? So if I may, Your Honor, several answers to that. First, the court in Thoracicum did explicitly limit its opinion to the context of expediting removal. I understand that its language on habeas is written in a way that is somewhat broader, but I will also note that this court has treated in, for example, pardon me, in Jordan in 2005, dealt with a petitioner who had left the country, reentered, and then was detained. So I think it would be a bad interpretation of the law to suggest that the only way in which Mr. Amati could claim relief would be to come to the country without a visa, be arrested, and then press his claim that we have now, because then he would have a claim for relief under habeas, and we would run into the same problems that we've highlighted. And an additional charge of illegal reentry, which... And an additional charge of illegal reentry. That's correct. So, Mr. Hartman, what is your best pitch for Mr. Amati to gain citizenship? Your Honor, I can see that several facts came to light during the argument today that we did not have on hand. They were very helpful, actually. I, Judge McKee, I'm inclined to agree. We still believe, however, in a circumstance like this, where there's a pro se petitioner who, you know, especially at the time that he went through the immigration process, would not have been in the weeds of how derivative citizenship worked and the various avenues he may have had, that the right thing to do here is to treat his statements that he is a citizen, which he made not only in this brief, but in several others that are included in the record, in particular at AR 121 and AR 49, to treat those as raising an issue of material facts sufficient to transfer this to the district court and allow a full record to be made. Conceitedly, that may be a very short proceeding, but allowing Mr. Amati to have his day in court as someone who claims citizenship is a small price to pay for ensuring that we defend what is, as this court's recognized several times, a paramount right. But our law is very clear that statements in a brief do not raise a material issue of fact. It's got to be something beyond the affidavits, filing, and that's why I was asking the kinds of questions I was asking to try to find out what happened before, I guess it was 1988, when Mr. Amati turned 18, whatever year that was, what happened before then? Yes, Your Honor, and the record, as we noted in the brief, is sparse in places and inconsistent in others, which is one of the reasons that we suggest that it may be well-suited either for a supplementation or for a transfer to the district court. Well, Mr. Anderson, I'm sure he's going to argue that the record is very consistent and that it's not inconsistent and that everything that's there suggests no naturalization derivatively. Judge McKee, you may well be correct on that score. Anything else, Judge Bemis, Judge Fuentes? Nothing, Your Honor. Okay. Mr. Anderson? You're muted, sir. You're muted. We can't hear you. Thank you, Your Honor. Good afternoon, Your Honor. Eric Anderson representing the Attorney General on the case before the court today. The present petition for review should be dismissed in its entirety. The 30-day deadline for filing a petition for judicial review in 8 U.S.C. 1252-B1 is provided by Congress and benefits both the executive and the judicial branches. It provides a measure of finality for the executive branch, and it prevents courts like this one from being overwhelmed with a flood of old and stale claims. How can you force that against him if he is a U.S. citizen? I come back to the fact that everything seems to turn on that. Well, Your Honor, we've addressed Mr. Hartnett for amicus has said there is no other way. We've presented two ways in our brief in which Mr. Amati could avail himself of every opportunity under 1252-B5. First is to get another order from the board, file another motion, tree open, have the board deny it, assuming that's what it's going to do. That's what it'll do. And then file a petition for review within 30 days. And this court would have full authority to exercise everything it wants to under 1252-B5. But we have a case now, don't we, in 1312, that we could construe as a petition for review and just do it that way, rather than requiring him to go through all those hoops? Yes, Your Honor, we addressed that in our brief. That would be an easy way for this court to both acknowledge the jurisdictional limit of 30 days and find it has jurisdiction to address the citizenship claim in this case. As we said in the brief, we would not be raising exhaustion if that case is the one being considered here today. However, the history of that case provides that Mr. Amati did not want that to be treated as a new PFR. And then when he was informed it's a new PFR, all you have to do is file an ISP motion or pay the fee. He did neither. He got his choice. That is his litigation choice. If the court wishes to revive that one, there'd be very little objection for me to make. And it seems to me we have to be aware of the fact, if he may have made a decision at that point not to pay the fee, may not have been able to pay the fee. And without counsel, I would imagine it's not that easy, especially from Afghanistan, to jump through the hurdles you have to jump through to get IFP status. And just in terms of fairness, it seems like we can do at least that much to make sure that he gets his day in court. They're going to argue he's had his day in court in the district court and now before us. But it seems to me like that might be the fairest. I'm not optimistic for Mr. Amati's position about the outcome of that result, but at least Mr. Amati might then be satisfied that Evy Avenue was exhausted on his behalf. I assume that's something within the court's discretion to do, and I would have little to rave against that decision. So if we are then in a situation in which case number 20-1312 is the one before the court, then the petition for review should be denied because there is no genuine issue of material facts and Mr. Amati has no claim under the Diversity and Citizenship Statute. We all have addressed he was born in 1970. He came as a refugee, admitted as an LPR, turned 18 in 1988. At that point, he could have filed a naturalization petition on his own behalf. He did not. When the notice to appear was served in 1997, Mr. Amati's parents' nationality and naturalization was not overlooked. In fact, there were discussions between his counsel and the immigration judge at the time about whether his father, who was seeking naturalization, could do so and would then seek a visa petition on his behalf. According to the record, which is consistent with the naturalization certificate that has been subsequently provided by Mr. Amati, Mr. Amati's father naturalized between June of 99 and March of 2000. So he was between 29 and 30 years of age. This naturalization took place too late for him to have a claim under the statute. And if their court has jurisdiction, the petition for review should be denied. And even my understanding is both the mother and father would have had to naturalize before the 18th birthday. Is that correct? That's right. So if the father didn't do it, that's enough. I mean, I don't have the dates of the mother's naturalization at hand. I know Mr. Amati has claimed it happened after the father's. That's also consistent with the immigration court record. But he would need both because his parents were both alive and married. And there is no genuine issue of material fact. If the court has jurisdiction, it should deny the petition. Mr. Anderson, is there any circumstance in which a petition for a motion to reopen won't be available? Because I think there's some force to Mr. Hartman's argument. I don't think it's a suspension clause problem, but I think it is a due process problem if there's no way to litigate citizenship. But your argument is that a motion to reopen is going to be available. But pulling the lens out from Mr. Amati's case to other people who claim they're citizens, will a motion to reopen always suffice? I have two responses to that, Your Honor. I mean, the first is if the board gets the motion, it's going to adjudicate it. I mean, I suppose there are some bare minimal procedural rules that would... Well, I would just say the board would adjudicate when it gets. The second is that another motion to reopen is the easiest way here, but is not the only one. We discussed 8 U.S.C. 1503 in our brief. That is explicitly a way in which individuals claiming a benefit as a national of the United States can obtain review of that claim. That is admittedly a much harder way than the additional motion to reopen way. 1503A applies to individuals in the United States who have had a benefit denied. 1503B and C are the avenues by which individuals outside the United States who have had a benefit denied. So the first step would be... My understanding is that this motion comes up in two ways. You apply for a passport and it gets denied, or you apply for a certificate of citizenship and it gets denied. And then B describes how you can go to a consular officer outside the United States, attempt to attain a certificate of identity. If that is unsuccessful, you have a right to appeal through... I'm sorry, just making sure there was not a question there. A right to appeal through the Secretary of State himself. And we cited Supreme Court briefings in our... In my brief, I cited Supreme Court briefings by the Solicitor General stating that the position of the United States is that judicial review of the Secretary of State's decision would be available under the APA. If you get the certificate of identity, you can come to the border and seek to enter as a citizen. And that 1503C statute explicitly provides for habeas review of an unsuccessful attempt to do that. This is admittedly a much harder way, but it is an avenue. And litigants don't always get to pick the easiest way to assert their claims. In this case, there is a very easy one. A new motion to reopen or the two avenues we addressed in our brief. We addressed both the reinstatement of the 20-1312 case, as well as a ripening theory. If the court has any questions about the... Our approach to ripening, I can address them. One reason to object to it, a finding that the current 19-2713 case ripened, that the government deserves at some point notice of what board decision it is defending. But assuming the court finds that it has jurisdiction, the position for review should be denied because there's no issue of material fact. We know when his father nationalized and it was too late. And unless there are any additional questions, we'd ask for it to be dismissed and if not dismissed, denied. I have a question. I'm not that familiar with the statute Mr. Ahmadi mentioned to us. Are you familiar with that statute, which would allow someone to be naturalized past the age of 18 based upon, I think, a derivative situation? No, I believe it's the Child Citizenship Act of 2000. Well, in 2000, Congress changed the rules for derivative citizens. At this point, Mr. Ahmadi was 30 and it was too late. Every court to have addressed it has said this is not retroactive. This court did so in, I believe, Morgan and Jordan, that because the statute was enacted after the relevant events, it doesn't have benefit. Also, I would note that requires at least one parent naturalizing before you turn 18. And if he's right that his mother naturalized after the father, then he would still have neither parent naturalizing before he turned 18. Any other questions at all? No, I do. Thank you. No time for rebuttal was reserved. Usually, that would mean that's the end of argument. I'm going to, given the inconvenience that Mr. Ahmadi is going to, Mr. Ahmadi has got to be, to the point, succinct and short. If you want to take a couple of minutes in rebuttal, which means just responding to anything Mr. Anderson may have said. It's not an opportunity to make additional arguments to us of anything you may have wanted to say, but didn't. But to the extent that Mr. Anderson has said something that you want to respond to the legal merits of, take a couple minutes and do that. Yes, Your Honor. Number one, about the Child Citizenship Act, this has never been settled in the Supreme Court until today. Okay. Now, Mr. Anderson said that we have cases, and he mentioned Morgan. If that's the case, we wouldn't wait for the Supreme Court. We might have a case that would bind us today, tie our hands, and not give us any leeway at all in terms of how we rule on that. Yes, Your Honor. I did most of the research on that case and on the cases that were cited in the note, in the footnote. I checked all of them from the beginning, since the Fifth Circuit. I think then the next one was the Ninth Circuit, then this circuit. There is nothing that supports the government. There is everything that supports me. Now, those judges that made those decisions, they just made it wildly. They did not go into details. The fact is… Mr. Maida, it may not surprise you, but sometimes judges make wild decisions. Yes, Your Honor. But when they do, it's on our court or the Supreme Court, that's it. We can't say, my colleagues made a wild decision, the Supreme Court made a wild decision. All we can say is, that's the law, that binds us, and we have no way around it. That may be the case here. You're correct, Your Honor. I am going to prove that those decisions are wrong, that my interpretation is the only correct and constitutional interpretation, which could go to the Supreme Court eventually. It might, because the government will not be happy if this circuit rules in my favor. The government is going to take the case to the Supreme Court, and I'm going to win there also. To do that, Mr. Ahmadi, may I make this point? It's really a point that Mr. Anderson made. Your best path going forward is to move to reopen this case. We can then consider all of the arguments that you wish to make. He mentioned the docket number. You know the case I'm talking about. What's wrong with that? Why don't you follow that path, which seems to give you a wider open door than the argument that you're making now? Your Honor, I thought about all of that. I have money. I can pay $5,000 fees if I have to. The money is not the issue. The thing is, if you look at that order... Mr. Anderson just said you made a strategic decision not to pay the fee, and I was assuming, well, maybe you couldn't afford to pay the fee. As we say, that's your bed, and maybe you have to sleep in that bed. Yes, Your Honor. That decision, the board decision, is basically like a blank piece of paper. There's nothing in there to review. If I file the fee and you... Mr. Ahmadi, this is not going to be as helpful as I thought it might be. I wanted to make sure that you had a chance to tell us anything that you wanted to in response to Mr. Anderson. This is not advancing the ball very much. We have what we call a 28-J letter, and Mr. Hartman's being involved now is a lot broader than he initially agreed to, but he may be willing to help you send a letter to us with additional argument. That's the best way to make the points you're making now. We will look at Morgan, and we'll have to make our own determination about the validity of that case. Your Honor, I just want to make one thing more clear, because so far I keep hearing citizen, citizen, citizen. I'm claiming U.S. national, nationals of the United States. Well, there are two. The citizen, nationality and citizenship, they're not synonymous. This court has ruled that in recent... I've been using the terms interchangeably because of the way the statutes here are worded, but you're right. The extent that I've suggested that only a citizenship situation would apply, it arises out of your argument that you are, in fact, a derivative citizen. But I understand that you began in your opening statement with the fact that you are a national and not a citizen, but why don't we conclude with that? And Mr. Mahdi, again, if you wanted to submit a 28-J letter, I assume you have a way to contact Mr. Hartman. Do you have his contact? Yes, Your Honor. Yes, Your Honor, yes. And hopefully he will go above and beyond what he's already agreed to do and help you with that letter. We'll take the matter under advisement, but Mr. Mahdi, I'm speaking only for myself now. As much as I would like to help you, frankly, and I could be outvoted by two colleagues, I don't think there's anything we can do for you. And I'm being as candid as I can because I don't want your hopes to get up. I've listened to your arguments. Your Honor, one thing I want to... Hold on, Mr. Mahdi. I've reviewed the law. I'm going to take a lot harder look at the child citizenship statute that you mentioned from what Mr. Anderson has said. I don't think it's going to be helpful. I don't want you to get your hopes up. Again, I'm only one vote. It may also be that I'll go back into this deeper and I'll change my mind when I think about your arguments, Mr. Hartman's arguments, and listen to my colleagues. I might well change my mind, but I'm not optimistic. I don't want you to get your hopes up, Mr. Mahdi. Frankly, I don't see anything that this court can do for you. But I could be wrong about that, and maybe I'd voted about it. But do submit your 28-J letter in consultation with Mr. Hartman. May I just add one last point, Your Honor? I'm a refugee. Remember, I came to the United States lawfully as a refugee. I am still today a refugee sitting in Pakistan under the United Nations UNHCR, which is the same. They are aware of my situation. A refugee went to the United States. They brought him back illegally. He did not commit a crime. He did not commit an aggravated felony. They did not like his face. They did not like his religion. They did not like the place where he was born. I don't know what the situation is. They're saying, you got to go back to the United States. That's where you belong. That's where your mother, your father, their citizens, you belong there. By law, they brought you here illegally. Now, number two, a refugee... Mr. Hamadi, you said you had one point. Now we're on to number two. So we're really... No, Your Honor, this is my first point in all my documents. It says I was admitted... I look forward to reading about this in your 28-J letter, Mr. Hamadi. I was admitted as a refugee. Mr. Hartman, I want to thank you very much for taking the Court's appointment and for the representation. It's important to us. It's important to the process. It's certainly important to Mr. Hamadi. And we thank you for undertaking that representation and for continuing to help him out in the legal issues that he wants to bring before us. Thank you, Judge. Greg, can you get a transcript? And the government would pay for that transcript. Yes, Judge. Thank you. You can adjourn then. Thank you, Judge. Court stands adjourned.